**Carolyn S. ZISSER, Plaintiff,**

v.

**The FLORIDA BAR, Defendant.**

**Case No. 3:09–cv–503–J–34JRK.**

United States District Court,
M.D. Florida,
Jacksonville Division.

March 29, 2010.

D. Gray Thomas, Matthew R. Kachergus, William J. Sheppard, Sheppard, White, Thomas & Kachergus, P.A., Jacksonville, FL, for Plaintiff.

Barry Scott Richard, Glenn Thomas Burhans, Jr., Karusha Y. Sharpe, Bridget Smitha, Greenberg Traurig, LLP, Tallahassee, FL, for Defendant.

### FINDINGS OF FACT AND CONCLUSIONS OF LAW

MARCIA MORALES HOWARD, District Judge.

In this action, the Plaintiff, Carolyn S. Zisser ("Zisser"), challenges the rules, policies and procedures adopted and utilized by the Defendant, the Florida Bar, in determining whether to grant an attorney board certification and recertification.

Specifically, Zisser challenges the inclusion of a confidential peer review component in the process based upon her contention that the Florida Bar's denial of her application for recertification based upon anonymous peer review deprived her of property and liberty interests without due process of law. Additionally, Zisser contends that the certification and recertification process is facially unconstitutional because it permits the Florida Bar to deny an applicant's request for certification or recertification based solely on anonymous peer review. The Court conducted a bench trial on the stipulated record on November 17, 2009. Set forth here, pursuant to Federal Rule of Civil Procedure 52, are the Court's findings of fact and conclusions of law.

### I. PROCEDURAL BACKGROUND

On June 5, 2009, Zisser filed a two-count complaint in the Middle District of Florida, seeking declaratory and injunctive relief, pursuant to 42 U.S.C. §§ 1983 and 1988 and 28 U.S.C. §§ 2201 and 2202.[1] *See* Verified Complaint (Doc. No. 1; Complaint). In the Complaint, Zisser asserted both facial and as-applied challenges to the Florida Bar's peer review confidentiality rules and policies. Count I asserted a claim for deprivation of property without due process of law as guaranteed by the Fourteenth Amendment. Count II alleged a deprivation of liberty under the same legal theory. That same day Zisser filed a motion for preliminary injunction. *See* Plaintiff's Motion for Preliminary Injunction and Memorandum of Law (Doc. No. 3; Motion for Prelim. Inj.). After the Court

---

1. Zisser filed the original complaint under a pseudonym: Lawyer Doe. She concurrently filed a motion with the Court seeking permission to proceed under the pseudonym because, in her view, the anonymous peer review that cost her recertification amounted to "anonymous character assassination" and suggested that she would be subject to further character assassination if forced to reveal her identity. *See* Plaintiff's Motion to Proceed Under Pseudonym and Request for Oral Argument (Doc. No. 2; Motion to Proceed Under Pseudonym). The Court denied the Motion to Proceed Under Pseudonym. *See* Order (Doc. No. 22).

held a hearing on July 15, 2009, Zisser, on August 3, 2009, filed an amended complaint in which she pled her facial and as-applied claims separately: Counts I and III presently before the Court assert facial challenges to the Florida Bar's confidential peer review process for certification and recertification based upon the allegation that it deprives applicants of property and liberty interests, respectively, while Counts II and IV assert as-applied challenges to the use of confidential per review on the same bases. *See* Amended Verified Complaint (Doc. No. 25; Amended Complaint). Zisser also contemporaneously filed an amended motion for preliminary injunction, *see* Plaintiff's Amended Motion for Preliminary Injunction and Memorandum of Law (Doc. No. 28; Amended Motion for Prelim. Inj.), which, at the behest of the parties and pursuant to Federal Rule of Civil Procedure 65(a)(2), the Court consolidated with the consideration of the merits of the case, *see* Order entered October 7, 2009 (Doc. No. 44). On November 17, 2009, the Court held a bench trial. Because the parties had stipulated earlier to the facts in the record, the Court heard only oral argument on the legal issues presented.

## II. FINDINGS OF FACT

In 1985, the Florida Bar established a certification for marital and family law designed to "identify those lawyers who practice marital and family law and have the special knowledge, skills, and proficiency, as well as the character, ethics, and reputation for professionalism to be properly identified to the public as board certified marital and family lawyers." R. Regulating Fla. Bar 6–6.1. Pursuant to the Rules Regulating the Florida Bar,[2] an attorney

seeking initial certification must satisfy the minimum standards for certification set forth in Rule 6–3.5 as well as any other specific requirements for certification established for the particular legal specialty in which certification is sought. *See* R. Regulating Fla. Bar 6–3.5(a). In addition to requiring an applicant to take a written examination, and satisfy criteria regarding years of practice, involvement in the area of law for which certification is sought, and completion of continuing legal education, Rule 6–3.5(c) requires applicants to submit to a peer review process. *See* R. Regulating Fla. Bar. 6–3.5(c). The utility and purpose of the peer review component in the certification process is described by the Rules as follows:

> Peer review shall be used to solicit information to assess competence in the specialty field, and professionalism and ethics in the practice of law. To qualify for board certification, an applicant must be recognized as having achieved a level of competence indicating special knowledge, skills, and proficiency in handling the usual matters in the speciality field. The applicant shall also be evaluated as to character, ethics, and reputation for professionalism. An applicant otherwise qualified may be denied certification on the basis of peer review. Certification may also be withheld pending the outcome of any disciplinary complaint or malpractice action.

> As part of the peer review process, the board of legal specialization and education and its area committees shall review an applicant's professionalism, ethics, and disciplinary record. Such review shall include both disciplinary complaints and malpractice actions. The process may also include solicita-

---

**2.** For brevity, the Court will refer to the Rules Regulating the Florida Bar simply as the "Rule(s)."

tion of public input and independent inquiry apart from written references. Peer review is mandatory for all applicants and may not be eliminated by equivalents.

R. Regulating Fla. Bar 6–3.5(c)(6).

According to the Rules governing certification, "[n]o certificat[ion] shall last for a period longer than five years." R. Regulating Fla. Bar 6–3.6. Thus, attorneys wishing to remain board certified must reapply at least every five years. To qualify for recertification, an applicant must meet certain minimum standards including: (1) demonstrating continued substantial involvement in the area for which certification was granted, (2) submitting evidence of completion of the requisite number of continuing legal education hours in the field of certification, and (3) receiving satisfactory peer review.[3] *See id.* An attorney who fails to obtain recertification may reapply for certification but must satisfy all of the requirements for initial certification.

The application for certification, which applicants are required to sign after swearing under oath that they have carefully read it, provides the following:

I FURTHER UNDERSTAND THAT THE PEER REVIEW PROCESS IS UNABLE TO SERVE ITS PURPOSE UNLESS THE INDIVIDUALS FROM WHOM INFORMATION IS REQUESTED ARE GUARANTEED COMPLETE CONFIDENTIALITY. BY APPLYING FOR CERTIFICA-

TION, I EXPRESSLY AGREE TO THE CONFIDENTIALITY OF THE PEER REVIEW PROCESS AND EXPRESSLY WAIVE ANY RIGHT TO REQUEST ANY INFORMATION OBTAINED THROUGH PEER REVIEW AT ANY STAGE OF THE CERTIFICATION PROCESS.

Declaration of Glenn T. Burhans, Jr. (Doc. No. 35; Burhans Decl.) at 194. The Rules reinforce the confidentiality provision by providing that all matters relating to certification, including tests and test scores, findings, recommendations, and the name of a reviewer and the content of the evaluation, are "confidential so far as consistent with the effective administration of this plan, fairness to the applicant, and due process of law." *See* R. Regulating Fla. Bar 6–3.12. Additionally, Policy 2.13(a) of the Florida Bar's Standing Policies of the Board of Legal Specialization and Education provides:

Consistent with Rule 6–3.12, Rules Regulating the Florida Bar, any materials obtained by the committee consisting of or containing comments by members of the bench and/or bar shall be treated as confidential.

In 1985, Zisser applied for certification and, after meeting the criteria then established by the Florida Bar, became board certified in the area of marital and family law.[4] Zisser applied for and was granted recertification in 1990 and 1995. She again applied for recertification in 2000, but her application was denied based on

---

**3.** In addition to the minimum standards, Rule 6–6.5 provides additional and more specific requirements for an individual seeking recertification in the area of marital and family law. *See* R. Regulating Fla. Bar 6–6.5.

**4.** As of the date of this Order, the minimum standards for board certification as a marital and family lawyer are as follows: (1) five years of actual practice, of which at least fifty

percent was dedicated to family law; (2) a minimum number of cases in the field; (3) satisfactory peer review; (4) completion of at least seventy five continuing legal education hours in marital and family law; and (5) a satisfactory score on a written examination. *See* R. Regulating Fla. Bar 6–6.3. The record is silent on whether the requirements were different when Zisser was initially certified.

unsatisfactory peer review. Zisser appealed this decision but for reasons not disclosed by the record, the Certification Plan Appeals Committee of the Board of Governors ("CPAC") stayed the appeal from March 2003 to March 2004. In late 2004, due to the passage of time, Zisser and the Florida Bar stipulated to the dismissal of the appeal, and Zisser was afforded another opportunity to apply for certification.

In 2005, Zisser submitted her application for recertification. The Marital and Family Law Certification Committee (the "Committee") of the Board of Legal Specialization and Education ("BLSE") considered her application and, on March 17, 2006, provided Zisser with notice that it intended to recommend to the BLSE that her recertification request be denied. Again, the Committee based its recommendation on adverse peer review—which reflected Zisser's poor reputation in the legal community. According to a letter sent to Zisser, the peer review component of her application revealed:

> [r]atings of below average to poor [for] consideration of client's interests, your reputation in the legal community for your ability to try a family law case, your reputation in the legal community for character, ethics, and professionalism, as well as to your ability to cooperate with opposing counsel and avoid litigation, especially in cases involving children.
>
> Apart from the rating provided by your peers and the judiciary, the committee also considered the supplemental commentary. The unvarying assessment is your tendency to over litigate your cases disproportionate to their size and to overcharge on your fees, resulting in excessive costs creating a financial hard-

ship for clients and a disservice to opposing counsel, the judiciary, and the legal system. Many find your knowledge in the area of family law to be exceptional, but your professional judgment poor. Discourtesy to opposing counsel and instances of unnecessary scheduling difficulties were cited.

Burhans Decl. at 75–76.

After receiving this letter, Zisser informed the Florida Bar of her intention to submit additional documentation to refute the Committee's assessment of her reputation. She also requested an extension of time to prepare her rebuttal which the Florida Bar granted. On April 13, 2006, Zisser sent a nine-page letter to the Committee in which she characterized its recommendation as flawed because it was based on anonymous peer review that, she argued, did not reflect the true perception of her held by her peers. In the letter, Zisser emphasized her expertise in the field of family law, noting that she had successfully litigated many difficult and contentious cases, had published several articles, and lectured at both local and statewide seminars. Because she perceived herself to be a distinguished litigator possessing a preeminent knowledge of family law, she noted that the Committee's recommendation based on adverse peer review left her "shocked and dismayed." In Zisser's view, there was a "dissonance between the reality of the extremely high level to which [she] practice[d] and the peer review" upon which the Committee relied. *See id.* at 82.

As for her poor ratings on reputation in the legal community for character, ethics, and professionalism, Zisser noted that Martindale–Hubbell had given her an "AV" rating.[5] In particular, she took issue

---

5. According to Martindale–Hubbell, "[a]n AV certification mark is a significant rating accomplishment—a testament to the fact that a lawyer's peers rank him or her at the highest

with the committee's conclusion that she was difficult and uncooperative to opposing counsel and tended to over litigate cases. Zisser stated, "I know that I am a fighter for my clients, but I should not be faulted for being a vigorous advocate or refused recertification for that reason." *Id.* at 87.

While Zisser criticized the Committee's reliance on anonymous peer review in general, she also specifically argued that "[t]he nature and secrecy of peer review handicaps my ability to further respond" to the adverse claims contained in the reviews. "Without being provided specific alleged instances underlying the peer review comments," Zisser asserted, "[i]t is impossible to provide specific responses or rebuttal." *Id.* at 88. As part of her letter, Zisser provided the Committee the names of several lawyers and judges for the Committee to contact so as to discern the true nature of her reputation. Zisser later supplemented her challenge with letters concerning an invitation she received to join the Florida Family Law American Inn of Court as a Master of the Inn.

After reviewing Zisser's April 13, 2006 response, the Committee nevertheless recommended that the BLSE deny recertification. Thereafter, on November 17, 2006, the BLSE informed Zisser that it had upheld the Committee's recommendation and denied her application for recertification.

On November 27, 2006, Zisser requested an appearance before the BLSE to challenge its decision. The BLSE granted that request and scheduled a hearing for March 2007. Prior to the hearing, Zisser served on the BLSE a pleading titled "Applicant's Motion to Remand"; the basis for which was her (1) inclusion in the 2007 edition of the *Bar Register of Preeminent Lawyers,* and (2) listing in the June 2007 issue of *Florida Super Lawyers.* Additionally, on February 13, 2007, Zisser submitted a Memorandum of Law in Support of Reversal of Denial of Recertification in which she mounted facial and as-applied challenges, under Article I, Section 9 of the Florida Constitution and the Fourteenth Amendment of the United States Constitution, to the anonymous peer review component of the certification process. She specifically challenged BLSE Policy 2.13(a), which, consistent with R. Regulating Fla. Bar 6–3.12, provides that "any materials obtained ... consisting of or containing comments by members of the bench and/or bar shall be treated as confidential."

Specifically, Zisser's facial challenge provided as follows:

> Facially, the BLSE policy relating to recertification peer review confidentiality, Policy 2.13(a), violates due process by failing to afford sufficient notice of the nature of adverse peer review statements and the identities of the makers of such statements, denying recertification applicants a meaningful opportunity to confront and defend against such allegations, including denial of any opportunity to confront and defend against such allegations, including denial of any opportunity to impeach the statements and impeach the makers of the statements for bias or other proper grounds for impeachment of witnesses.

Burhans Decl. at 136. She further argued, "The peer review process as applied ... in this case specifically violates [my] right to fairness and due process of law because in fact [I] was not afforded sufficient notice of the allegations ..., depriving [me] of the

---

level of professional excellence." h ttp://www. martindale.com/xp/l egal/About_Martindale/Products_and_Services/Peer_Re- view_Ratings/ratings.xml (last visited November 3, 2009).

opportunity to prepare and present a defense against such allegations." *Id.* at 136–37.

On March 9, 2007, Zisser, accompanied by counsel, appeared before the BLSE where her counsel pressed her due process challenges to the confidential peer review process. A Committee representative also appeared at the hearing and reiterated the Committee's reasoning for denying Zisser's application, stating as follows:

> There were numerous—and not isolated, but numerous people who have responded that Ms. Zisser should not be recertified. And as a committee member, I was there witnessing the deliberations, going over the responses, reviewing the responses, and it was—to answer some of Ms. Zisser's concerns, the people that responded to the peer review are preeminent family law attorneys in Jacksonville, there are people who responded who are not preeminent family law attorneys in Jacksonville, and there were judges or judicial officials that responded. It was a very broad range process [sic.], and there were numerous, numerous people who responded that Ms. Zisser should not be recertified.

*Id.* at 167. Following the hearing, the BLSE voted to uphold the Committee's decision to deny Zisser's application. Zisser then appealed the BLSE's final decision to the CPAC, advancing the same claims brought before the BLSE. The CPAC affirmed the BLSE, saying,

> Upon review of the entire record and after consideration of the arguments made during oral argument, CPAC finds that the Applicant [Zisser] failed to carry the burden of making a clear and convincing showing of arbitrary, capricious or fraudulent denial of procedural

rights or misapplication of BLSE Policies or the Rules Regulating The Florida Bar.

Declaration of Dawna Bicknell (Doc. No. 15–1; Bicknell Decl.) at App. 3. Zisser appealed the CPAC's ruling to the Board of Governors ("BOG"). On April 10, 2008, the BOG denied her petition and adopted the CPAC's decision to deny her recertification. Pursuant to Rule 6–3.10, after exhausting her appeals before the Florida Bar, Zisser sought "judicial review" by the Supreme Court of Florida.[6] *See* R. Regulating Fla. Bar 6–3.10 ("Exhaustion of this right of appeal shall be a condition precedent to judicial review by the Florida Supreme Court.") The court summarily denied her petition for review, saying, "Petitioner's Petition for Review of Denial of Recertification ... [is] hereby denied." *Id.* at App. 5. Her state appeals having come to a disappointing end, Zisser initiated the instant action.

## III. CONCLUSIONS OF LAW

Zisser presents two principle arguments in this action. First, Zisser challenges the Florida Bar's certification process, as applied to her, arguing that in denying her recertification "solely on the basis of anonymous and vaguely-described peer review" the Florida Bar violated her fundamental right to due process. Next, she asserts facial challenges, contending that the confidentiality rules and policies protecting anonymous peer review deprive her and all "similarly-situated applicants for recertification and certification" of property and liberty interests. Upon consideration of the record in this action, and the arguments presented, the Court finds that Zisser's claims must fail. First, pursuant to

---

**6.** A copy of the Petition for Review of Denial of Recertification Zisser filed with the Florida Supreme Court is attached to Defendant's No-

tice of Filing dated November 5, 2009. *See* Doc. No. 47.

the time-honored *Rooker–Feldman* [7] doctrine, Zisser's as-applied challenge to the confidentiality rules and policies established by the Florida Bar must be dismissed. Next, Zisser's facial challenges fail as she cannot identify a choate property or liberty interest in board certification or recertification to which the strictures of Constitutional due process attach.

### A. Zisser's As–Applied Challenges

In Counts II and IV of her Amended Complaint, Zisser contends that the Florida Bar deprived her of a property interest (Count II) and a liberty interest (Count IV) without due process of law in violation of the Fourteenth Amendment to the United States Constitution. As relief for this deprivation, Zisser seeks an order requiring the Florida Bar to "forthwith grant Plaintiff's certification in the area of marital and family law" as well as additional relief. *See* Amended Complaint at 9.

■ Under the *Rooker–Feldman* doctrine federal district courts generally lack jurisdiction to review final judgments resulting from state court proceedings. *Lance v. Dennis,* 546 U.S. 459, 460, 126 S.Ct. 1198, 1199, 163 L.Ed.2d 1059 (2006) (quoting *Exxon Mobil Corp. v. Saudi Basic Industries Corp.,* 544 U.S. 280, 284, 125 S.Ct. 1517, 1521–22, 161 L.Ed.2d 454 (2005)); *Goodman ex rel. Goodman v. Sipos,* 259 F.3d 1327, 1332 (11th Cir.2001); *see also Brown v. R.J. Reynolds Tobacco Co.,* 576 F.Supp.2d 1328, 1336–37 (M.D.Fla.2008) ("In the run-of-the-mill fact pattern justifying application of the doctrine, as exemplified by the facts of *Rooker,*" an unsuccessful state court litigant "files a mirror image case in federal court invoking the federal court's federal question jurisdiction, 28 U.S.C. § 1331, asking

the federal court to void or modify a state court judgment on grounds that it is unconstitutional."). In *Rooker v. Fidelity Trust Co.,* 263 U.S. 413, 44 S.Ct. 149, 68 L.Ed. 362 (1923), unsuccessful state court litigants turned to the federal district court seeking relief. Claiming that the state court had entered a judgment in contravention of the Constitution, they asked the district court to declare it "null and void." *Id.* at 414–15, 44 S.Ct. at 149–50. The district court declined to entertain the challenge, and the Supreme Court upheld the federal court's dismissal of the action. In doing so, the Court explained, after noting that the state court had acted within its jurisdiction, that even assuming the state court's decision was contrary to the Constitution and its constitutional jurisprudence, "that did not make the judgment void, but merely left it open to reversal or modification in an appropriate and timely appellate proceeding." *Id.* at 415, 44 S.Ct. at 150. "Federal district courts, the *Rooker* Court recognized, lacked the requisite appellate authority for their jurisdiction was 'strictly original.'" *Exxon Mobil,* 544 U.S. at 284, 125 S.Ct. at 1522. By enacting 28 U.S.C. § 1257, Congress vested only the Supreme Court with appellate jurisdiction "to reverse or modify" state court judgments. *Rooker,* 263 U.S. at 416, 44 S.Ct. at 150. The Court, therefore, affirmed the lower court's decree dismissing the suit for lack of subject matter jurisdiction. *Id.* at 415, 44 S.Ct. at 150.

Sixty years later, the Supreme Court had occasion to further consider the contours of a federal district court's jurisdictional limit. *See District of Columbia Court of Appeals v. Feldman,* 460 U.S. 462, 103 S.Ct. 1303, 75 L.Ed.2d 206 (1983). There, two plaintiffs, neither of whom

---

7. *Rooker v. Fidelity Trust Co.,* 263 U.S. 413, 44 S.Ct. 149, 68 L.Ed. 362 (1923), and *District of Columbia Court of Appeals v. Feldman,* 460 U.S. 462, 103 S.Ct. 1303, 75 L.Ed.2d 206 (1983).

graduated from an accredited law school, asked the District of Columbia Court of Appeals to waive its requirement that D.C. bar applicants graduate from a law school accredited by the American Bar Association in order to take the bar examination. The D.C. court denied the petitions, prompting the parties to file suit in federal district court. *Id.* at 465–73, 103 S.Ct. at 1305–10. The district court and the Court of Appeals for the District of Columbia disagreed on whether the petitions could be maintained and the Supreme Court granted certiorari.

Consistent with its *Rooker* decision, the Court reaffirmed that district courts lack the authority to review state court judgments, as only it possessed appellate jurisdiction over such decisions. *Feldman,* 460 U.S. at 476, 103 S.Ct. at 1311. However, the Court recognized that the "crucial question" raised by the plaintiffs' action in determining the applicability of the doctrine was whether the proceedings before the D.C. court were "judicial in nature." *Id.* According to the Supreme Court, in upholding the application of its accreditation rule to deny the plaintiffs' petitions, the D.C. court had acted judicially in that it was called upon to "investigate, declare and enforce 'liabilities as they [stood] on present or past facts and under laws supposed already to exist.'" *Id.* at 479–82, 103 S.Ct. at 1313–14. Hence, "to the extent that [the plaintiffs] sought review in the District Court of the District of Columbia Court of Appeals' denial of their petitions for waiver, the District Court lacked subject-matter jurisdiction over their complaints." *Id.* at 482, 103 S.Ct. at 1315. That determination, however, did not dispose of the entire case, for in promulgating the bar admission rule, the Court said, the D.C. court acted legislatively, not judicial-

ly. *Id.* at 485–486, 103 S.Ct. at 1316–17. "Challenges to the constitutionality of state bar rules," the Court explained, "do not necessarily require a United States district court to review a final state-court judgment in a judicial proceeding." *Id.* at 486, 103 S.Ct. at 1317. Thus, the Court reasoned 28 U.S.C. § 1257 did not bar district court proceedings addressed to the validity of the accreditation rule itself. *Feldman,* 460 U.S. at 486, 103 S.Ct. at 1317. Rather, the rule was subject to a facial challenge, the Court held, but plaintiffs could not seek review of the rule's application. *Id.*

The Court then reviewed the parties' complaints to separate the claims that failed the jurisdictional threshold from those that survived jurisdictional scrutiny. With respect to the contention that the D.C. court acted arbitrarily in denying the waiver petitions, given that court's "former policy of granting waivers to graduates of unaccredited law schools," the Court held the claim could not be pursued because it was "inextricably intertwined with the [D.C. court's] decisions, in judicial proceedings, to deny [plaintiffs'] petitions." *Id.* at 486–487, 103 S.Ct. at 1317. On the other hand, the Court determined that the plaintiffs could maintain "claims that the [bar admission] rule is unconstitutional because it creates an irrebuttable presumption that only graduates of accredited law schools are fit to practice law, discriminates against those who have obtained equivalent legal training by other means, and impermissibly delegates the District of Columbia Court of Appeals' power to regulate the bar to the American Bar Association," because those claims "do not require review of a judicial decision in a particular case."[8] *Id.* at 487, 103 S.Ct. at 1317.

8. The Court left open the question of whether the doctrine of *res judicata* foreclosed litiga-

tion of the elements of the complaints spared from dismissal for want of subject-matter ju-

■ This case is strikingly similar to *Feldman* and Zisser's as-applied challenge falls snuggly within the contours of the *Rooker–Feldman* doctrine. Upon having her application for recertification denied by the BLSE, Zisser appealed through the available state channels provided by the Rules governing the Florida Bar. At each stage, Zisser argued that the BLSE's anonymous peer review policy violated due process. Having exhausted her appeals before the Florida Bar, Zisser sought judicial review of the BOG decision. *See* R. Regulating Fla. Bar 6–3.10. The Florida Supreme Court denied her petition for review and that denial was a judicial action. Thus, this Court, as *Rooker–Feldman* makes clear, is without jurisdiction to review that decision, as its jurisdiction is "strictly original." *Exxon Mobil,* 544 U.S. at 284, 125 S.Ct. at 1522.

■ Zisser attempts to elude this result by arguing that the Florida Supreme Court did not enter a final judgment on the merits because it issued a terse Order merely stating that her petition was denied. This assertion elevates hope beyond reason as the very facts of *Feldman* demonstrate. In *Feldman,* the D.C. court likewise issued a court order providing only that "on consideration of the petition," it was denied. 460 U.S. at 472, 103 S.Ct. at

1309. Regardless of the brevity of the order denying the petition, the Court found that the D.C. court had adjudicated the matter. *Id.* at 480–81, 103 S.Ct. at 1314. Elevating substance over form, the Court noted that bar proceedings often do not "assume the form commonly associated with judicial proceedings," but nevertheless concluded that since the state court had determined as a legal matter that the plaintiff was not entitled to the relief sought, it had adjudicated the matter. *Id.* at 481, 103 S.Ct. at 1314. "[T]he form of the proceeding is not significant. It is the nature and effect which is controlling." *Id.* at 482, 103 S.Ct. at 1314. Similarly, although the Florida Supreme Court chose not to express its reasons for denying Zisser's petition, it indeed issued an order denying Zisser the relief she requested.[9] "This is the essence of a judicial proceeding." *Id.* at 481, 103 S.Ct. at 1314.

The Eleventh Circuit has likewise not focused on the length and depth of a state court decision when determining the applicability of *Rooker–Feldman.* For example, in *Berman v. Florida Board of Bar Examiners,* 794 F.2d 1529 (11th Cir.1986), the plaintiff, an out-of-state attorney seeking to avoid "the Horrors of the Bar Exam," filed a request that the Florida Bar waive the examination requirement.

---

risdiction. *Id.* at 487–488, 103 S.Ct. at 1317; *see Brown,* 576 F.Supp.2d at 1335 (noting that the *Rooker–Feldman* doctrine and preclusion law, "[a]lthough distinct in name and function ... [,] often operate in the same channel of analysis.").

9. The Court declines to accept Zisser's contention that the fact that the Florida Supreme Court's Order does not state that it "duly considered" the petition or gave the petition "due consideration" should be interpreted as evidence or confirmation of her contention that the court did not actually resolve her request on the merits. Zisser filed her "Petitioner for Review of Denial of Recertification" with the Florida Supreme Court requesting

that the court "reverse the denial of her Application for Recertification." Petition at 1. As a basis for reversal, Zisser raised the very same constitutional arguments raised here and concluded "accordingly, the denial of petitioner [sic] application for recertification should be reversed." *Id.* at 20. There certainly could be no confusion or misunderstanding as to the nature of Zisser's claim or the relief that she sought. The Florida Supreme Court denied that Petition and cited as authority the Rules challenged within Zisser's Petition. In doing so, the court determined, as a legal matter, that Zisser was not entitled to the relief she sought.

*Id.* at 1529. The Bar denied his request and the plaintiff filed a petition seeking review by the Florida Supreme Court, which dismissed the petition "without opinion or statement of reasons." *Id.* at 1530. Like Zisser, the plaintiff then filed a § 1983 action in federal court alleging constitutional violations. *Id.* The Eleventh Circuit, affirming the district court and dismissing the case under *Rooker–Feldman*, explained that the federal suit was "clearly a challenge to a state court judicial proceeding...." *Id.* Implicit to *Berman's* holding was the conclusion that the Florida Supreme Court's dismissal of the plaintiff's petition "without opinion or statement of reasons" was a final judgment on the merits. *See Johnson v. DeSoto County Bd. of Comm'rs.*, 72 F.3d 1556, 1561 (11th Cir.1996) (noting that an implicit holding is binding).

Undaunted by these decisions, Zisser directs the Court to several Eleventh Circuit and district court decisions that she believes decided as-applied challenges to bar rules notwithstanding the *Rooker–Feldman* doctrine. These cases are inapposite, as they do not involve state judicial action. In *Jacobs v. Florida Bar*, 50 F.3d 901 (11th Cir.1995), the appellants brought claims challenging the constitutionality of several rules regulating attorney advertising that had been promulgated by the Supreme Court of Florida. *Id.* at 902. The appellants did not challenge the rules in any state judicial proceeding; instead, they filed suit in federal court seeking an injunction prohibiting the enforcement of the rules and a declaratory judgment that the rules were unconstitutional. *Id.* Similarly, in *Mason v. Florida Bar*, 208 F.3d 952 (11th Cir.2000), the appellant challenged a rule regulating attorney advertising. After the Florida Bar issued an opinion stating that the appellant's advertisement violated the rule, and after "exhaust[ing] his administrative appeals," as provided solely by the Florida Bar, the appellant sought relief in federal district court, asserting as-applied and facial challenges to the rule. *Id.* at 954. Again, the district court was not faced with a request to review or reverse the outcome of a state court judicial proceeding. Similarly, no state judicial proceeding was before the court in *Harrell v. Florida Bar*, No. 3:08–cv–15–J–33TEM, 2008 WL 596086 (M.D.Fla. Feb. 29, 2008), where the plaintiff filed suit after the Florida Bar issued an opinion finding that a proposed advertisement ran afoul of its regulations. *Id.* at *1–*3. Contrary to Zisser's representations, *Harrell, Jacobs* and *Mason* simply confirm the well-settled rule that *Rooker–Feldman's* jurisdictional sting is felt only when state courts have considered the issue.

■ Pursuant to the *Rooker–Feldman* doctrine, a federal district court lacks jurisdiction to review state court decisions where: " '(1) the party in federal court is the same as the party in state court; (2) the prior state court ruling was a final or conclusive judgment on the merits; (3) the party seeking relief in federal court had a reasonable opportunity to raise its federal claims in the state court proceeding; [10] and (4) the issue before the federal court was either adjudicated by the state court or was inextricably intertwined with the state court's judgment.' " *Storck v. City of Coral Springs*, 354 F.3d 1307, 1310 n. 1 (11th Cir.2003) (quoting *Amos v. Glynn County Bd. of Tax Assessors*, 347 F.3d 1249, 1265

---

**10.** This factor does not require that the plaintiff actually raise the federal claims in state court. *See Thompson v. McFatter*, 951 F.Supp. 221, 224 (M.D.Ala.1996). Moreover,

"[w]hen a plaintiff actually appeals to a state court, the Eleventh Circuit has held that a reasonable opportunity existed." *Id.*

n. 11 (11th Cir.2003)). The Eleventh Circuit has further defined the "inextricably intertwined" requirement as the situation when a " 'federal claim succeeds only to the extent that the state court wrongly decided the issues before it.' " *See Goodman ex rel. Goodman,* 259 F.3d at 1332 (quoting *Siegel v. LePore,* 234 F.3d 1163, 1172 (11th Cir.2000) (en banc)). Thus, this Court does not have jurisdiction when a plaintiff's claims necessarily result in a reexamination of the state court decision. *See Cooper–Jolley v. Lyttle,* 3 F.Supp.2d 1446, 1448 (N.D.Ga.1998).

In the instant case, Zisser's as-applied claims simply seek to overturn the state court's resolution of her request for recertification, and as such, the *Rooker–Feldman* doctrine bars these claims. Zisser was a party to the state court proceeding about which she complains. That proceeding resulted in final or conclusive judgment of the Florida Supreme Court with regard to her application for recertification. Zisser raised the very challenges now before the Court with the Florida Bar and in her Petition before the Florida Supreme Court. Finally, there is no question that Zisser's current claims are inextricably intertwined with the state court proceedings. *See Storck,* 354 F.3d at 1310 n. 1. Indeed, as Zisser's request for relief makes plain, her as-applied challenge to the Florida Bar's rules and regulations succeeds only to the extent that this Court reviews the decision of the Florida Supreme Court and finds that the court wrongly decided the matters before it. *See Goodman ex rel. Goodman,* 259 F.3d at 1332. This Court has no authority to engage in such an inquiry.

Because the *Rooker–Feldman* doctrine bars federal district courts from entertaining challenges to state court decisions, and because Zisser's as-applied claims are certainly such a challenge, the claims set forth in Counts II and IV of her Amended Complaint must fail.

**B. Zisser's Facial Challenges**

Zisser next posits facial challenges to the certification process arguing that Policy 2.13(a) of the Florida Bar's Standing Policies of the Board of Legal Specialization—which provides for confidentiality of peer review commentary in the certification and recertification review process—violates due process. She contends that this policy, which is consistent with Rule 6–3.12, fails to afford sufficient notice of the content of peer review statements and the identities of the makers of those statements, thereby depriving certification or recertification applicants the opportunity to meaningfully challenge an adverse finding.

 "A facial challenge, as distinguished from an as-applied challenge, seeks to invalidate a statute or regulation itself." *United States v. Frandsen,* 212 F.3d 1231, 1235 (11th Cir.2000). Where a plaintiff mounts a facial challenge, she bears the burden of proving that the regulation could never be applied in a constitutional manner. *Jacobs,* 50 F.3d at 906 n. 20. This is because a party who asserts a facial challenge to a statute is seeking not only to vindicate her own rights, but also those of others who may be adversely impacted by the statute. *Horton v. City of St. Augustine,* 272 F.3d 1318, 1331 n. 12 (11th Cir.2001) (citing *City of Chicago v. Morales,* 527 U.S. 41, 55, n. 22, 119 S.Ct. 1849, 144 L.Ed.2d 67 (1999)).

 The essence of procedural due process is notice and an opportunity to be heard. *See Mathews v. Eldridge,* 424 U.S. 319, 348, 96 S.Ct. 893, 909, 47 L.Ed.2d 18 (1976). The basic purport of due process is that, before a deprivation of either property or liberty takes place at the hands of the state, the affected person must be

forewarned and afforded an opportunity to be heard "at a meaningful time and in a meaningful manner." *Armstrong v. Manzo,* 380 U.S. 545, 552, 85 S.Ct. 1187, 1191, 14 L.Ed.2d 62 (1965). As the rubric's name implies, "procedural due process" is simply "a guarantee of fair procedure." *Zinermon v. Burch,* 494 U.S. 113, 110 S.Ct. 975, 983, 108 L.Ed.2d 100 (1990).

■ "A § 1983 action alleging a procedural due process clause violation requires proof of three elements: a deprivation of a constitutionally-protected liberty or property interest; state action; and constitutionally inadequate process." *Cryder v. Oxendine,* 24 F.3d 175, 177 (11th Cir.1994); *see also Bank of Jackson County v. Cherry,* 980 F.2d 1362, 1366 (11th Cir.1993) (describing the elements as: "(1) a constitutionally protected interest in life, liberty, or property; (2) governmental deprivation of that interest; and (3) the constitutional inadequacy of procedures accompanying the deprivation."). Failure to establish any one of these elements is fatal to a plaintiff's procedural due process claim under § 1983. *See Bank of Jackson County,* 980 F.2d at 1366. For the reasons set forth below, the Court concludes that Zisser has failed to carry her burden of establishing a constitutionally protected property or liberty interest. Accordingly, her procedural due process claim under § 1983 must fail.

### 1. Property Interest

■ Property interests are "created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law-rules or understandings that secure certain benefits and that support claims of entitlement to those benefits." *Bd. of Regents v. Roth,* 408 U.S. 564, 577, 92 S.Ct. 2701, 2709, 33 L.Ed.2d 548 (1972). "To have a property interest in a benefit, a person clearly must have more than an abstract need or desire for it. [She] must have more than a unilateral expectation of it. [She] must, instead, have a legitimate claim of entitlement to it." *Id.* "[A] legitimate claim of entitlement is created only when the statutes or regulations in question establish a framework of factual conditions delimiting entitlements which are capable of being explored in a due process hearing." *Eidson v. Pierce,* 745 F.2d 453, 459–60 (7th Cir.1984). Put another way, a person has a legitimate claim of entitlement to keep that which presently securely belongs to that person. Where state law provides a benefit and creates a system governing revocation or renewal of that benefit, the recipients have a secure and durable property right, a legitimate claim of entitlement. *Reed v. Village of Shorewood,* 704 F.2d 943, 948 (7th Cir.1983) ("[P]roperty is what is securely and durably yours under state ... law as distinct from what you hold subject to so many conditions as to make your interest meager, transitory, or uncertain."). Accordingly, the salient issue is whether state law provides Zisser, and putative applicants, a secure and durable interest in board certification.

■ Preliminarily, the Court finds no support for Zisser's rather conclusory suggestion that initial applicants for board certification have a constitutionally protected property interest in obtaining board certification. Nothing in the Rules supports a finding that an applicant for board certification has a legitimate entitlement to obtaining board certification much less a secure and durable interest in obtaining such a designation. Moreover, Zisser's reliance on *Coleman v. Watts,* 81 So.2d 650 (Fla.1955) and *Willner v. Committee on Character and Fitness,* 373 U.S. 96, 83 S.Ct. 1175, 10 L.Ed.2d 224 (1963) is misplaced. These cases addressed the right

to procedural due process in connection with the denial of an applicant's admission to practice before the state bar altogether. Denial of board certification, however, does not exclude an individual from the practice of law. Indeed, it imposes *no* restriction whatsoever on a licensed attorney's ability to practice law in the state. The Rules relating to board certification specifically address this issue:

**Rule 6–3.4**

(a) **Limit on right to practice.** No standard shall be approved that shall, in any way, limit the right of a certificate holder to practice law in all areas.

(b) **Certification not required to practice.** No lawyer shall be required to be certified before practicing law in any particular area.

. . .

(d) **Voluntary nature of plan.** Participation in the plan shall be on a voluntary basis.

R. Regulating Fla. Bar 6–3.4. The record before the Court affirmatively establishes that an attorney's inability to obtain board certification does not in any way prevent the attorney from engaging in her occupation. Indeed, the absence of board certification does not prevent an attorney from appearing before any court or from accepting any particular client or cause of action.

In further support of her contention that applicants for initial certification have a property interest in obtaining board certification, Zisser refers the Court to a line of cases concerning the denial of hospital staff privileges to physicians. *See Shaw v. Hosp. Auth. of Cobb County,* 507 F.2d 625, 626 (5th Cir.1975) (finding that a physician, "in seeking staff privileges at [a] hospital, seeks to engage in his occupation . . . and this is a liberty interest protected by the Fourteenth Amendment."); *Shahawy v. Harrison,* 875 F.2d 1529, 1532 (11th Cir. 1989) (recognizing in the context of a termination of medical privileges that the physician had a property interest protected by the Fourteenth Amendment guarantee of procedural due process). These cases are inapposite, however, as they concern the property and liberty interest vested in one's present ability to engage in a chosen occupation. As noted above, unlike hospital staff privileges, which provide physicians with the ability to employ their skills at a hospital, board certification provides no such benefit and is irrelevant to an attorney's ability to practice or appear before any court.

Moreover, in *Shaw* the court declined to consider whether a physician had a property interest in obtaining staff privileges at a hospital, and instead, concluded that the physician had a protected liberty interest. Thus, *Shaw* provides no support for the contention that applicants for initial board certification have a property interest in obtaining such certification. Additionally, a review of *Shahawy* discloses that Zisser's reliance on that decision is similarly misplaced. While the decision broadly discusses a physician's property interest in medical staff privileges, it does so in the context of the termination of those privileges. *See Shahawy,* 875 F.2d at 1530 ("Having found a property interest, we now consider whether Dr. Shahawy was afforded procedural due process when medical staff privileges were terminated."). Indeed, it is important to note that the 1989 *Shahawy* decision is actually the second visit of Dr. Shahawy to the Eleventh Circuit Court of Appeals.[11] *See Shahawy v. Harrison,* 778 F.2d 636 (11th Cir.1985); opinion amended *Shahawy v. Harrison,* 790 F.2d 75 (11th Cir.1986) (amended to

---

**11.** The Court will refer to the two *Shahawy* decisions in their chronological order as *Sha-* *hawy I,* 778 F.2d 636 (11th Cir.1985) and *Shahawy II,* 875 F.2d 1529 (11th Cir.1989).

correct an error not relevant to the discussion here). A brief review of the facts giving rise to Dr. Shahawy's appeals is warranted.

Dr. Shahawy initially filed suit challenging the hospital board's denial of his request for cardiac catheterization laboratory privileges on due process grounds and asserting various other anti-trust, civil rights and common law claims. *See Shahawy I,* 778 F.2d at 637–38. After the district court dismissed his due process claims, Dr. Shahawy appealed. *See id.* On appeal, the Eleventh Circuit affirmed the dismissal of the due process claims based upon a finding that Dr. Shahawy had no constitutionally protected property or liberty interest in obtaining cardiac catheterization laboratory privileges. *See Shahawy II,* 875 F.2d at 1531; *Shahawy I,* 778 F.2d at 642–644. However, between the district court's dismissal of the original complaint and the Eleventh Circuit's entry of a ruling on the appeal, the hospital board declined to renew Shahawy's medical staff privileges. *See Shahawy II,* 875 F.2d at 1531. Thus, he filed an amended complaint alleging a violation of due process "based on the termination of his staff privileges." *Id.* It is the appeal stemming from the resolution of the claims in his amended complaint to which Zisser directs the Court. That decision provides no support for the finding of a protected property interest in initial certification. Additionally, the court's decision in *Shahawy I* strongly suggests there is no such interest.

In *Shahawy I,* the doctor unsuccessfully challenged the hospital's denial of his request for cardiac catheterization laboratory privileges. The court began by rejecting Dr. Shahawy's reliance on cases relating to the termination of medical staff privileges. *See Shahawy I,* 778 F.2d at 642–43. In doing so, the court explained that Dr. Shahawy had not alleged any injury to a contract right nor an inability to practice medicine without cardiac catheterization privileges. The court then drew from a Fifth Circuit Court of Appeals decision, *Daly v. Sprague,* 675 F.2d 716 (5th Cir.1982), which it described as "a case similar to our own." *Id.* at 643. The court noted that in *Daly,* the Fifth Circuit rejected a doctor's claim that he had a protected property interest in specific clinical privileges. *Id.* at 727. The court noted:

> *Daly* provides no facts to show that his clinical privileges would be analogous to medical staff privileges, that there was any explicit or implicit written or oral agreement or understanding which created an entitlement to these privileges or that the removal of his clinical privileges actually totally foreclosed his ability to practice.

*Id.* Additionally, the *Shahawy I* court noted that under Florida law, a physician's use of a public hospital was not a right, but rather a privilege, and that Dr. Shahawy had demonstrated no entitlement to such privilege. *See Shahawy I,* 778 F.2d at 643. Thus, the court determined that Dr. Shahawy had no property interest in cardiac catheterization laboratory privileges. *See id.*

Here, as in *Shahawy I,* Zisser has provided no facts to support a claim that board certification is analogous to medical staff privileges (or a license to practice law). She has identified no agreement or understanding which would create an entitlement to board certification, and she has adduced no evidence that a denial of board certification would foreclose, even partially, an attorney's ability to practice law. Accordingly, neither *Shaw* nor the *Shahawy* decisions support Zisser's contention that an applicant for board certification has a claim of entitlement that is so legitimate that the Constitution must define the

procedure attending its removal. *See id.* at 642.

■ Next, the Court considers whether an attorney previously certified in a legal specialty has a constitutionally recognizable property interest in recertification. The Rules promulgated by the Florida Bar regarding board certification do not establish a right to recertification. Instead, the rules explicitly provide that board certification lasts for only a specific period of time—five years—and candidates seeking to continue to be board certified must apply for recertification. The Rules further provide that applicants for recertification are subject to the same discretionary standards as candidates seeking certification for the first time—the only distinction being that recertification candidates need not pass a written examination. R. Regulating Fla. Bar 6–3.5(c)(6). Recertification candidates, accordingly, must undergo peer review and receive satisfactory evaluations. Reviewers at the recertification stage are asked to provide an assessment of the applicant based on the applicant's performance during a specific period of time, the preceding five years. *See* R. Regulating Fla. Bar 6–6.5. Finally, the Florida Bar's right to refuse recertification is expressly recognized in its Rules. *See* R. Regulating Fla. Bar 6–3.6(c) & 6–3.10. Thus, pursuant to the Rules, the successful applicant for board certification receives a ticket for one ride, but one ride (of five years) only; a following ride requires a new ticket. *Cf. Smith v. Allwright*, 321 U.S. 649, 669, 64 S.Ct. 757, 768, 88 L.Ed. 987 (1944) (Roberts, J., dissenting).

Courts have consistently rejected the argument that a prior grant of a benefit without more creates a property interest in receiving future grants of the same benefit. For example, in *Roth*, the Supreme Court rejected a non-tenured professor's claim of a vested property interest in continued employment, noting that while the professor "surely had an abstract interest in being rehired ... he did not have a property interest sufficient to require the University authorities to ... renew his contract for employment." *Id.* at 578, 92 S.Ct. at 2709.

> The important fact in this case is that they specifically provided that the respondent's employment was to terminate on June 30. They did not provide for contract renewal absent 'sufficient cause.' Indeed, they made no provision for renewal whatsoever. Thus, the terms of the respondent's appointment secured absolutely no interest in reemployment for the next year, they supported absolutely no possible claim of entitlement to reemployment.

*Id.* In *Schwartz v. Mayor's Committee on Judiciary of City of New York*, 816 F.2d 54 (2d Cir.1987), the court found that a former judge of the Family Court of New York had no property interest in reappointment. The court reached this conclusion despite the plaintiff's argument that it was her "understanding that incumbent judges of proven competence were routinely appointed." *Id.* at 57. The court explained that "the fact that many, or even most, incumbent judges have been reappointed cannot operate to raise appellant's subjective expectation to a constitutionally protected right." *Id.* (quotation and citation omitted). Similarly, in *Szabo Food Serv., Inc. v. Canteen Corp.*, 823 F.2d 1073 (7th Cir.1987), the Seventh Circuit Court of Appeals held that a company had no right to renewal of a food service contract solely by virtue of its use on past contracts. *Id.* at 1080. The *Szabo* court stated the applicable rule succinctly: "A person has a 'property' interest in an expectation of renewal only if state law so provides. A unilateral expectation of renewal is not a property interest." 823

F.2d at 1080 (citations omitted). Finally, and most like the case at hand, in *Reis v. Texas Board of Legal Specialization,* 2002 WL 32126265 (W.D.Tex. Oct. 8, 2002), a district court in Texas rejected an attorney's argument that she possessed an entitlement to being certified as an estate planning and probate attorney.[12] The *Reis* court reasoned that since the rules governing certification were discretionary, that is the Texas Board of Legal Specialization had discretion to set speciality standards, and because there was no evidence that noncertification would prevent or impair her ability to practice law, the plaintiff failed to articulate a liberty or property interest in board certification. *Id.* at *4;[13]

At bottom, Zisser's property interest argument is based on the misguided belief that state law creates a property right in board certification, but the clear text of the Florida Bar Rules contradicts that belief. Indeed, the fact that the standards for recertification each relate to an individual's practice and accomplishments specifically during the preceding five year period signifies that "recertification" is based not upon the fact of initial certification or historical accomplishments and reputation, but rather on the accomplishments and practice of the applicant *since* the prior certification. *See* R. Regulating Fla. Bar 6–6.5 As such, Zisser has posited nothing more than a unilateral "subjective expectation" that she and similar applicants will be necessarily recertified. *Schwartz,* 816 F.2d at 57. However, property interests do not flow from ill-advised expectations. *See Perry v. Sindermann,* 408 U.S. 593, 601, 603, 92 S.Ct. 2694, 2699, 2700, 33 L.Ed.2d 570 (1972) (noting that a protectible property interest may be established by a "mutually explicit understanding" and not a unilateral "expectancy").

### 2. Liberty Interest

■ Painting with a broader brush, Zisser asserts that a broad liberty interest accrues in the status of achieving board certification. Her argument does not rest, however, on the thin proposition that certification standing alone creates such an interest. Instead, she asserts that the liberty interest arises as a result of the reputational *accoutrements* attendant to the status, explaining that board certification signals preeminence in the legal field and is integral to a well-established business reputation. Necessarily, she contends that the Florida Bar's failure to certify [14] an applicant implies that the individual is incapable of performing at the highest levels of the profession, and so damages the individual's reputation in the legal commu-

---

**12.** The Court recognizes that a Texas state court of appeals appears to have reached a contrary conclusion in *State Bar of Texas v. Leighton,* 956 S.W.2d 667 (Tx. Court App. 1997). The *Leighton* case involved a denial of an attorney's request for recertification in one speciality (tax law) and a revocation of his certification in another specialty (estate planning and probate law). The court concluded, without citation of any authority or analysis, that the attorney had been denied due process when he was not given notice and an opportunity to be heard on the revocation of his certification and his request for recertification. The Court finds the decision in *Reis* to be better reasoned and more persuasive.

**13.** The *Reis* court cited *Martin v. Memorial Hospital at Gulfport,* 130 F.3d 1143, 1147 (5th Cir.1997) for the proposition that "a person's ability to practice their chosen profession must be 'effectively foreclosed' in a certain area to constitute a deprivation of a liberty interest." *Reis,* 2002 WL 32126265, at *4.

**14.** For purposes of considering the liberty issue, the terms "certify" and "certification" apply to both initial certification and recertification.

nity that his or her ability to continue practicing law is compromised.

■ Liberty interests are broader in scope and more amorphous in their construction, because, unlike property interests, they do not exist "in concrete entitlements secured by independent sources of law." *Cherry*, 980 F.2d at 1367. However, liberty interests are only implicated when the government "impair[s] one's ability to take advantage of a legal right such as a right to be considered for government contracts or employment or a right to seek non-government employment, [so] that the government can be said to have 'foreclosed' one's ability to take advantage of it and thus extinguished the right." *Mosrie v. Barry*, 718 F.2d 1151, 1160–61 (D.C.Cir. 1983) (citing *Paul v. Davis*, 424 U.S. 693, 96 S.Ct. 1155, 47 L.Ed.2d 405 (1976)). Formulated as such, a liberty interest in professional reputation is contingent in nature; becoming whole only where there is a showing that the government has impaired a person's ability to exercise the right—the liberty interest flows from the deprivation. *Marrero v. City of Hialeah*, 625 F.2d 499, 514 (5th Cir.1980).

Professional reputation is defined by its utility, which is to "provide value inhering in the favorable consideration of customers arising from a business's reputation as being well established and well conducted." *Id.* at 515. As such, the value of a business reputation is measured by the degree to which it allows a person to pursue their chosen occupation, and a liberty interest may arise when the government deprives a person of that value.

■ In order to establish a claim that government action has deprived an individual of a liberty interest in reputation, "the plaintiff must show: (1) a stigmatizing allegation, (2) dissemination or publication of that allegation, and (3) loss of some tangible interest due to publication of the stigmatizing allegation." *Cherry*, 980 F.2d at 1367 (internal citations omitted). This test, which has come to be known as the "stigma-plus" test requires that "a plaintiff claiming a deprivation based on defamation by the government must establish the fact of the defamation 'plus' the violation of some more tangible interest before the plaintiff is entitled to invoke the procedural protections of the due process clause." *Behrens v. Regier*, 422 F.3d 1255, 1259–60 (11th Cir.2005) (citing *Paul v. Davis*, 424 U.S. 693, 701–02, 96 S.Ct. 1155, 1161, 47 L.Ed.2d 405 (1976)). Additionally, the Eleventh Circuit Court of Appeals has explained that "the defamatory communication need not cause the loss of the protected right, or more tangible interest, ... it is sufficient that the defamation occur in connection with and be reasonably related to the alteration of the right or interest. *See Marrero*, 625 F.2d at 519.

Where the "tangible interest" alleged to be damaged for the purpose of satisfying the "plus" requirement is one's professional reputation, the applicable analysis requires consideration of two scenarios. First, in connection with the denial of the right the government may have essentially published a charge against the applicant so serious it would "damage [her] standing and associations in [the] community." *Roth*, 408 U.S. at 573–74, 92 S.Ct. at 2707. Second, the stigma caused by the government's actions may foreclose a "range of employment opportunities" to the claimant. *Id.*; *see also Paul*, 424 U.S. at 701, 96 S.Ct. 1155, 1160, 47 L.Ed.2d 405 (1976) (explaining that widespread defamation of plaintiff was not a deprivation of liberty because the supposed damage to reputation was not accompanied by any tangible loss).

The *Marrero* decision provides guidance for employing this analysis. There, police officers unconstitutionally executed a

search warrant in plaintiffs' jewelry store. As the officers were executing the search warrant, several reporters appeared on the scene. After placing the plaintiffs under arrest, the police announced to the media that "over $75,000 in stolen property had been recovered," when actually none of the items listed in the warrant, save one, had been located. *Marrero,* 625 F.2d at 502. Plaintiffs argued that as a result of the government's actions their personal and business reputations were destroyed, depriving them of their right to earn a living in their chosen occupation. *Id.* at 502–03. Accepting the plaintiffs' argument, the court said, "When the government impairs those interests by leveling defamatory charges of a kind which also inescapably harm an individual's protected business interests, the reputational interests rise to the level of liberty interests and the fourteenth amendment demands no less than full compliance with due process of the law." *Id.* at 516.

Similarly, in *Little v. City of North Miami,* 805 F.2d 962 (11th Cir.1986), a law professor brought a deprivation of liberty claim arising from a City Council's passage and publication of a resolution censuring him for "improper use of public funds." *Id.* at 964. Because of the severity of the allegation and the resulting stigma accompanying it—which could necessarily foreclose future job opportunities—the court found that the plaintiff had pled facts sufficient to establish a valid liberty interest. *See id.* at 969; *see also Roth,* 408 U.S. at 573, 92 S.Ct. at 2707 (finding that publicly made charges that an individual is guilty of dishonesty or immorality are stigmatizing because they call into question the person's "good name, reputation, honor, or integrity").

Unlike *Marrero* and *Little,* in *Roth,* the Court found that the plaintiff had failed to establish a protected liberty interest where "[t]he State, in declining to rehire the respondent, did not make any charge against him that might seriously damage his standing and associations in his community . . . and there [was] no suggestion that the State in declining to re-employ the respondent, imposed on him a stigma or other disability that foreclosed his freedom to take advantage of other employment opportunities." *Roth,* 408 U.S. at 573–74, 92 S.Ct. at 2707.

Preliminarily, the Court finds nothing in the record to support Zisser's contention that the absence of board certification, imposes a stigma so grievous as to damage an applicant's standing in the legal field or the broader community. A denial of certification does not imply that a candidate is incompetent, unethical, or otherwise incapable of discharging her duties as an attorney. *See Roth,* 408 U.S. at 573, 92 S.Ct. at 2707. The Florida Bar designed the certification program to identify those members of the bar who practice law at the highest level and demonstrate exceptional "character, ethics, and reputation for professionalism." *See* R. Regulating Fla. Bar 6–6.1. In short, the program seeks to honor and identify to the public the most exceptional attorneys practicing in their chosen field. A denial of certification, at most, denotes that the candidate, in the eyes of the Florida Bar, does not fall within this select group, nothing more. Surely not all can claim the vestiges of the elite.

Moreover, an attorney that is denied board certification is not identified as such. Instead, an attorney having been denied board certification is like any other attorney who just does not happen to be board certified. The lack of certification may be because the attorney chose not to apply, because the attorney was too busy with client representation to complete the requisite number of trials or hours of CLE, or any number of other non-stigmatizing rea-

sons. The absence of certification communicates nothing derogatory about the level of competence of such persons.[15] Simply put, a denial of certification, while perhaps disappointing to the applicant, is not accompanied by any stigma, much less a stigma so serious as to damage one's reputation in the community or foreclose a range of employment opportunities. The Constitution does not guarantee everyone a blue ribbon. *See Schwartz,* 816 F.2d at 57 (finding that a state committee's failure to recommend a judge for reappointment did not amount to a claim that the candidate was unqualified, "rather it indicate[d] that [the Committee] found she was not one of the *best* qualified candidates") (emphasis in original).

 Next, the Court considers as a broad proposition whether the Florida Bar, in connection with its denials of certification, has in the past or will in the future, publish statements regarding unsuccessful applicants that might damage their standing and associations in the community. *Roth,* 408 U.S. at 573, 92 S.Ct. at 2707. The record is devoid of anything suggesting that the Florida Bar has published or will publish any statement regarding whether an individual has been denied certification much less the reasons for such denial. The Supreme Court has said, without publication, an individual's liberty claim is "doomed." *Cleveland Bd. of Educ. v. Loudermill,* 470 U.S. 532, 547 n. 13, 105 S.Ct. 1487, 1496 n. 13, 84 L.Ed.2d 494 (1985); *see also Brandt v. Bd. of Co-op. Educ. Servs.,* 820 F.2d 41, 43–45 (2d Cir.1987) ("[N]o liberty interest is implicated where there has been no public disclosure of the reasons for the discharge."); *Cherry,* 980 F.2d at 1367 ("A stigmatizing allegation does not implicate liberty interests unless it is published.").

 The Court also considers whether a denial of certification would foreclose an applicant's "range of opportunities" in the legal field. *See Roth,* 408 U.S. at 574, 92 S.Ct. at 2707. As previously noted, the Rules provide that the absence of board certification does not in any way limit an attorney's ability to practice in the state or to practice in any area of the law. For her part, Zisser provided no evidence suggesting that an applicant denied certification can no longer practice law in a particular forum or practice area or that she will have any added difficulty attaining future employment. *See id.* at 575, 92 S.Ct. at 2708 ("It stretches the concept too far to suggest that a person is deprived of 'liberty' when he simply is not rehired in one job but remains as free as before to seek another.") In fact, there exists not a scintilla of evidence that the absence or loss of board certification has any negative reputational effect at all. No evidence was even offered demonstrating that a client was more likely to retain a board certified attorney than a non-certified attorney or that the legal community would ostracize an attorney who was not board certified. All that was offered were conclusory statements by counsel that Zisser had held herself out to the public as being board certified on her website and letterhead and attorneys who have and will do likewise in the future will suffer reputational harm if forced to remove the designation. This contention, in addition to being overstated, is unsupported by the record, as there is no indication that any opportunity will be foreclosed as a result of being forced to

---

**15.** Similarly, the absence of continuing certification for one previously board certified in a particular area of law discloses nothing about the applicant's competence. The absence of continued certification could simply reflect an individual's decision not to seek recertification for any number of reasons.

remove the phrase "Board Certified" from one's website or letterhead.[16]

Tellingly, Zisser stated that she considered achieving board certification the "pinnacle" of her career and she, and others like her, may be disappointed, if not embarrassed, to be denied or to lose the designation. This speaks to the degree of worth the recipient attributes to the designation, and correspondingly, to oneself as a recipient of the designation; that is not the standard when adjudging professional reputational harm. Professional reputation concerns the estimation and regard in which a person is held by the public and the value that inures to the professional as a result. *Marrero*, 625 F.2d at 514; *see also* Webster's Third New International Dictionary 1929 (1966) (defining reputation as "a particular character in popular estimation or ascription"). Zisser has failed to demonstrate that the Florida Bar's action in denying certification so seriously impacts the public regard in which an attorney is held as to implicate a liberty interest. The mere withholding by the state of an emolument cannot support a constitutional claim.

■ While the Court considers the question of whether an applicant for certification has a liberty interest in obtaining such certification to be a single question regardless of whether it is the initial certification or a recertification, in an abundance of caution, the Court will briefly address the possibility that the loss of a previously granted certification implicates a liberty interest. On this issue, the Court finds the Eleventh Circuit's decision in *Behrens* to be instructive. The *Behrens* plaintiff contended that he was deprived of a liberty interest without due process of law when Florida's Department of Children and Families verified allegations of child abuse against him which ultimately interfered with his right to adopt another child. *Behrens*, 422 F.3d at 1257. The court recognized the applicable standard to be: "to establish a liberty interest sufficient to implicate the Fourteenth Amendment safeguards, the individual must be not only stigmatized but also stigmatized in connection with a denial of a right or status previously recognized under state law." *Id.* at 1260. The court had no difficulty concluding that the verification of child abuse allegations was a sufficiently stigmatizing act but found "the more difficult question [to be] whether Behrens had satisfied the 'plus' requirement." *Id.* at 1261. In support of his contention that he was deprived of a protected liberty interest, Behrens argued he had obtained a protectible legal status due to the fact that he had previously adopted a child. *See id.* Noting that the fact that an individual has previously adopted a child does not confer on that person the right to adopt again, the court concluded that Behrens had established no protectible legal status. *See id.* at 1262. The court explained:

> Florida law provides that each adoption is a separate act that requires independent consideration and approval. As a result, the fact that Behrens was previously deemed fit to adopt a child did not provide him with a right or a distinct legal status that has been recognized and protected under Florida law.

*Id.* at 1263. Similarly, under the Rules, each certification is a separate act that requires the applicant to have satisfied the stated requirements during the previous five year period as well as consideration of the responses to peer review inquiries re-

**16.** Likewise, there is no indication that being denied the right to post the designation will foreclose any opportunities.

garding the applicant's practice during that specific period of time. A prior certification, however, does not provide an applicant for recertification with any recognized distinct legal status.

Zisser attempts to elude the conclusion that an attorney has no recognized liberty interest in obtaining board certification by relying on *Shaw* and *Shahawy II*. In *Shaw*, the court explained that the term "liberty ... extends to the full range of conduct which the individual is free to pursue." *Shaw*, 507 F.2d at 628. "And that contemplated within this term is the right to practice any of the common occupations of life." *Id.* As the physician plaintiff was seeking to engage in his occupation by seeking staff privileges, the court determined that he had a liberty interest protected by the Fourteenth Amendment. As previously discussed, this Court has concluded that an individual seeking board certification in a particular speciality is not seeking to engage in her occupation and the denial of board certification does not limit that right in any way. Thus, the reliance on *Shaw* is misplaced.

Similarly, as noted previously, the *Shahawy* decisions are of little benefit to Zisser. *Shahawy II* contains no discussion of liberty interests and *Shahawy I* counsels against finding a protected liberty interest under the facts at hand. In *Shahawy I*, having determined that Dr. Shahawy had no property interest in cardiac catheterization laboratory privileges, the Eleventh Circuit Court of Appeals also considered whether the denial of such privileges constituted the denial of a liberty interest. *Shahawy I*, 778 F.2d at 643. The court concluded that Dr. Shahawy failed to show that he was " 'stigmatized' in connection with a denial of a right or a status previously recognized under the law." *Id.* at

643 (citing *Moore v. Otero*, 557 F.2d 435, 437 (5th Cir.1977)). The court explained "[e]ven assuming that Shahawy's deprivation of cardiac catheterization privileges stigmatized him, his retention of full staff privileges at the Sarasota Hospital 'absent any showing that he had an entitlement to the [cardiac catheterization] privileges negates his claim that he was denied 'liberty.' " *Shahawy I*, 778 F.2d at 644 (quoting *Daly*, 675 F.2d at 728). Thus, while the denial of cardiac catheterization laboratory privileges limited Dr. Shahawy's practice in some respect and perhaps stigmatized him in some respect, the court found that because he retained full staff privileges at the hospital, and because he had shown no entitlement to cardiac catheterization laboratory privileges, he failed to establish the existence of a liberty interest entitled to due process protection. Here, as in *Shahawy I*, absent a showing that an attorney has an entitlement to recertification, even assuming a deprivation of recertification, the fact that the attorney retains an unlimited ability to practice law as a member of the Florida Bar negates her claim of a liberty interest in certification. Having considered Zisser's various contentions, the Court finds that she has failed to establish that applicants for board certification have a constitutionally protected liberty interest in obtaining certification.

To succeed on a § 1983 action alleging a violation of procedural due process, a plaintiff must establish the existence of a constitutionally protected property or liberty interest. *See Cryder v. Oxendine*, 24 F.3d 175, 177 (11th Cir.1994). As this Court determines that applicants for board certification or recertification have neither a protected property interest nor a protected liberty interest in obtaining such certification, Zisser's facial challenges presented in Counts I and III of her Amend-

ed Complaint are due to be denied.[17]

## IV. CONCLUSION

Upon consideration of the record in this action, the arguments of counsel and the applicable authority, the Court concludes that Zisser's claims are due to be dismissed. Zisser's as-applied challenges, in Counts II and IV of the Amended Complaint, to the Florida Bar's confidentiality Rules with regard to the confidential peer review component of the board certification process are barred by the *Rooker–Feldman* doctrine. Additionally, with regard to Counts I and III of the Amended Complaint, Zisser has failed to satisfy the requisite elements of a procedural due process violation as she has identified no constitutionally protected property or liberty interest of which she has been deprived. Thus, the Amended Motion for Preliminary Injunction is due to be denied and judgment entered in favor of the Florida Bar.

In light of the foregoing, it is hereby

**ORDERED:**

1. Plaintiff's Amended Motion for Preliminary Injunction and Memorandum of Law (Doc. No. 28) is **DENIED.**

2. The Court finds *in favor of the Defendant, the Florida Bar,* and against Plaintiff, Carolyn Zisser, on her claims for injunctive and declaratory relief.

3. The Clerk of the Court is directed to enter judgment in accordance with this order and close the file.

---

**17.** The Court recognizes Zisser's contention that even absent such an interest, Rule 6–3.12 provides that confidentiality will be maintained consistent with the due process of law. Thus, she seems to argue that the Court should determine whether she received adequate process regardless of her inability to identify a legally protected interest. However, having failed to state a claim for a procedural due process deprivation, Zisser is not entitled to a review of the process afforded to her. Moreover, to the extent that she contends the Bar's inclusion of the words "con-

sistent with due process of law" required the Bar (in order to comply with its own Rules) to provide certain process such assertion does nothing to alleviate her failure to identify a legal protected interest. Additionally, to the extent Zisser contends that inclusion of this language required the Bar to provide such due process as would be required under the Fourteenth Amendment, the Court has determined that because she has identified no legally protected property or liberty interest, the procedural due process guarantees of the Fourteenth Amendment are inapplicable.